**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
Newark Vicinage**

| | |
|---|---|
| JOSEPH MELE,<br><br>*Plaintiff,*<br><br>v.<br><br>MEDIDATA SOLUTIONS, INC.,<br><br>*Defendant.* | **Case No. ___________**<br><br>**NOTICE OF REMOVAL** |

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1332 and 1441, Defendant Medidata Solutions, Inc. ("Medidata"), by its undersigned attorneys, hereby files this Notice of Removal, removing to the United States District Court for the District of New Jersey the action brought by Plaintiff Joseph Mele in the Superior Court of New Jersey, Law Division, Middlesex County, Case No. MID-L-001959-25 (the "State Court Action"). In support of its Notice of Removal, Medidata states as follows:

**BACKGROUND**

1. On April 1, 2025, Plaintiff filed a lawsuit in the Superior Court of New Jersey, Law Division, Middlesex County captioned *Joseph F. Mele v. Medidata Solutions, Inc.* at case number MID-L-001959-25.[1] *See generally* **Ex. A**, Compl.

2. The Complaint was served on April 3, 2025. *See* **Ex. C**.

---

[1] On April 3, 2025, the docket was updated with a deficiency notice related to the Complaint filed on April 1, 2025. The Complaint was refiled on April 4, 2025 with a correction to the caption. *See* **Ex. B.** In all other respects, the April 4, 2025 Complaint was identical to the original Complaint filed on April 1, 2025.

3. The Complaint alleges three claims arising out Medidata's alleged "constructive discharge" of Plaintiff on October 4, 2024. **Ex. B**, Compl. ¶¶ 9, 11-53.

4. In particular, Plaintiff alleges that Medidata violated the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 *et seq*., by retaliating against Plaintiff, that Medidata wrongfully discharged Mele in violation of public policy, and that Medidata was unjustly enriched. *See* **Ex. B**, Compl. ¶¶ 11-53.

5. Medidata has not yet filed an answer to Plaintiff's Complaint.

6. Copies of the (i) Summons and Complaint and (ii) Proof of Service—which constitute "all process, pleadings, and orders served upon" Medidata in the State Court Action pursuant to 28 U.S.C. § 1446—are attached as **Exhibits A, B and C** to this Notice of Removal.

**PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN SATISFIED**

7. This Notice of Removal is filed within 30 days of the date that Medidata received notice of the Complaint in the State Court Action, April 1, 2025. It is therefore timely filed under 28 U.S.C. § 1446(b).

8. This Notice of Removal complies with Rule 11 of the Federal Rules of Civil Procedure.

9. Removal of this case is not precluded by the provisions of 28 U.S.C. § 1445.

10. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(a) because the United States District Court for the District of New Jersey is the federal judicial district embracing the state court where the State Court Action was originally commenced, the Superior Court of New Jersey, Law Division, Middlesex County.

11. A copy of this Notice of Removal will be filed in the Superior Court of New Jersey, Law Division, Middlesex County, and served on all adverse parties as required by 28 U.S.C. § 1446(d).

**GROUNDS FOR REMOVAL**

12. This action is one in which the Court has original subject matter jurisdiction under 28 U.S.C. § 1332 and may be removed to this Court under 28 U.S.C. § 1441(a).

13. Plaintiff resides in and is a citizen of the State of New Jersey. **Ex. B**, Compl. ¶ 3.

14. Medidata is a corporation organized under the laws of Delaware with its principal place of business in New York. Thus, Medidata is a citizen of Delaware and New York. *See* 28 U.S.C. § 1332(c)(1); *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).

15. Because Mele is a citizen of New Jersey and Medidata is a citizen of Delaware and New York, complete diversity of citizenship exists under 28 U.S.C. § 1332.

16. In accordance with New Jersey Court Rule 4:5-2, Mele's Complaint does not allege a specific amount of damages. *See generally* **Ex. B**, Compl.

17. Where the Complaint alleges no specific amount of damages, the removing party bears the burden of demonstrating by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional minimum of $75,000. *See Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016). That burden "is not especially onerous." *Id.* A "defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014).

18. "The amount in controversy is not measured by the low-end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." *Auto-Owners Ins.*, 835 F.3d at 397 (quoting *Angus v. Shiley, Inc.*, 989 F.2d 142, 146 (3d Cir. 1993)).

19. Here, Plaintiff alleges that he was wrongfully discharged in violation of CEPA and public policy and further alleges that Medidata was unjustly enriched. *See* **Ex. B**, Compl. ¶¶ 11-53. Plaintiff seeks, among other relief, "actual, consequential, compensatory, nominal and punitive damages," "reasonable costs, attorney's fees, and civil fines," and "pre-judgment and post-judgment interest." **Ex. B**, Compl. at 8, 9, 11.

20. A defendant held liable for CEPA violations may be liable for "compensation for all lost wages, benefits and other renumeration," "reasonable costs[] and attorney's fees," civil fines, and/or punitive damages. N.J.S.A. 34:19-5; *see Chinchilla v. Geodis Am., Inc.*, No. 23-1995 (MAS) (TJB), 2024 WL 943424, at *5 (D.N.J. Mar. 5, 2024).

21. A defendant held liable for wrongful discharge may be liable for, among other things, "the amount [plaintiff] would have earned from the time of wrongful discharge for a reasonable time until he or she finds new employment," "expenses associated with finding new employment and mental anguish or emotional distress damages proximately related to the retaliatory discharge," and punitive damages. *Potter v. Village Bank of N.J.*, 225 N.J. Super. 547, 562-63 (App. Div. 1988).

22. Further, under his unjust enrichment claim, Plaintiff seeks the purported "increased bonuses and pay to him based upon his commissions" that he would have received in absence of Medidata's alleged wrongful conduct. **Ex. B**, Compl. ¶¶ 50-53.

23. Given Plaintiff's allegations, and the potential liability Medidata faces—including punitive damages and payment of attorneys' fees—the amount in controversy exceeds the

jurisdictional minimum of $75,000. *See Chinchilla*, 2024 WL 943424, at *5 ("[Plaintiff] also seeks punitive damages and attorneys' fees, both of which, collectively, could reasonably result in a damage award over $75,000"); *see also Uddin v. Sears, Roebuck & Co.*, No. 13-6504 (JLL), 2014 WL 316988, at *5 (D.N.J. Jan. 27, 2014) (punitive damages and attorneys' fees must be considered in determining amount in controversy).

**CONCLUSION**

24. For the foregoing reasons, all requirements for diversity jurisdiction and removal have been met.

25. By filing this Notice of Removal, Medidata does not waive any rights or defenses available to it, including that Plaintiff's claims are subject to mandatory arbitration under the terms of the Mutual Arbitration Agreement, executed on November 1, 2018.

26. By filing this Notice of Removal, Medidata does not admit any of the allegations in Mele's Complaint.

WHEREFORE, Medidata removes the above-captioned action from the Superior Court of New Jersey, Law Division, Middlesex County to the United States District Court for New Jersey.

Dated: May 1, 2025
New York, New York

Respectfully submitted,

DEWEY PEGNO & KRAMARSKY LLP

*/s/ Jenifer L. Salzberg*

Jenifer L. Salzberg
Ariel P. Cannon*
777 Third Avenue, 29th Floor
New York, NY 10017
Tel.: (212) 943-9000
Fax: (212) 943-4325
acannon@dpklaw.com
jsalzberg@dpklaw.com
* Motion for *pro hac vice* admission forthcoming

*Counsel for Medidata Solutions, Inc.*

# EXHIBIT A

PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
Ellen O'Connell, Esq. (Bar No. 029631983)
eoconnell@pricemeese.com
50 Tice Boulevard
Woodcliff Lake, NJ 07675
(201) 391-3737 ext. 125
Attorneys for Plaintiff, Joseph F. Mele

| | |
|---|---|
| JOSEPH F. MELE | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiff, | DOCKET NO. : |
| vs. | CIVIL ACTION |
| MEDIDATA SOLUTIONS INC., A Delaware Corporation. | **COMPLAINT AND JURY DEMAND** |
| Defendant | |

Plaintiff, through his undersigned counsel, hereby complains against the defendant as follows:

**THE PARTIES**

1. Plaintiff Joseph F. Mele, at all relevant times, was a resident of the State of New Jersey, residing at 15 Washington Valley Road, Morristown, Morris County, New Jersey.

2. Defendant Medidata Solutions, Inc., (herein after "Medidata"), upon information and belief Medidata, is organized under the laws of the State of Delaware and has an office

located in the State of New Jersey located at 194 S. Wood Avenue Iselin, Middlesex County, New Jersey. Medidata is registered under the laws of this State and as such is qualified to transact business in New Jersey.

**JURISDICTION AND VENUE**

3. This court has jurisdiction over the defendant Medidata because it has agents for the transaction of business in New Jersey and provides services to persons located in New Jersey, including the office in Iselin, New Jersey, plaintiff's last assigned place of work .

4. Venue is proper in this County pursuant to R. 4:3-2 (b) of the Rules of Court because Medidata has a place for doing business in this County.

**GENERAL BACKGROUND**

5. Medidata provides cloud-based computer systems for clinical research and pharmaceutical development. Medidata has up to 90% market share in large and mid-size clinical research organizations. More than 70% of novel drugs approved by the FDA in 2022 used Medidata software.

6. Plaintiff was employed as a high-performing executive for Medidata Solutions, Inc. since 2018, with laudable performance reviews and awards. He was promoted to Vice President, Global Partners in Medidata's "America's Enterprise" division from April 1, 2022, through October 4, 2024, where he managed a global team of approximately 50 people.

7. Plaintiff engaged in activity protected by the New Jersey Conscientious Employee Protection Act ("CEPA") by complaining to supervisors and refusing to engage in illegal activity.

8. Plaintiff's supervisor and other executives of Medidata knew that he engaged in CEPA-protected activity. Despite knowing that Plaintiff was engaged in protected activity pursuant to CEPA, as a result of Plaintiff's complaints to supervisors and other corporate officers, Medidata engaged in conduct which is barred under CEPA.

9. Plaintiff's supervisor and other executives demoted and constructively discharged him on October 4, 2024, because: he complained to his supervisor and during Division sales meetings about fraudulent and illegal business activity; highlighted this institutionalized fraud in his presentations at sales meetings; instructed his direct reports not to engage in these fraudulent and illegal acts and refused to obey his supervisor's directives to condone the bad acts.

10. As a result, plaintiff's supervisor demoted him and later transferred him to a new position that had been created for him, had no job description, no compensation bonus plan and no direct reports doing work outside of the Clinical Research platform, which no reasonable executive would be expected to accept. The aforementioned action by Medidata resulted in the constructive and improper discharge of Plaintiff.

**FIRST COUNT**
**Violation of the Conscientious Employee Protection Act**

11. Plaintiff incorporates the allegations of paragraphs 1 through 10 above, as if fully and completely set-forth herein.

12. Medidata describes itself as providing "the most used platform for clinical trials around the world, powering tens of thousands of clinical trials, with millions of patients[1]." The clinical trials are for drug research and development conducted by pharmaceutical companies.

---

[1] www.medidata.com/en/leadership/tarek-sherif/

The pharmaceutical companies hire clinical research organizations ("CROs") which conduct and report the results of the clinical trials pursuant to FDA regulations.

13. At all times relevant plaintiff was responsible for selling Medidata's software and cloud services to the CROs.

14. Medidata and CROs sign a "Medidata Partnership Agreement" (the "Partnership Agreement") by which Medidata licenses to the CROs the right to use the software and platform for clinical trials that the CROs conducted for their sponsors, the pharmaceutical companies.

15. There is a clause in the Partnership Agreement where Medidata agrees that it will not use confidential information, including "Partner Data", without the prior written consent of the Partner [CRO]."

16. Partner Data includes the information that the CRO gives Medidata about the sales the CROs make to the pharmaceutical companies, including when the CRO presents a bid to a pharmaceutical company, how they are bidding, and when the CRO is the successful bidder and wins the contract with the pharmaceutical company.

17. In the course of his employment, plaintiff became aware of improper practices within his department. Medidata's improper practices included, but were not limited to, the following:

a. Section 7.03 of the Partner Agreements were breached as Partner Data in CROs' bids were disclosed and converted to benefit Medidata.
b. 18 U.S.C. §1341 and 1143, Frauds and Wire Fraud were violated because of Medidata's scheme to defraud the CROs by breaching the Partnership Agreement using the U.S. mails and email.

18. A division of Medidata, the Direct Sales Division, started authorizing its salespersons to breach the confidentiality term of the Partnership Agreement for thousands of clinical trials being conducted around the world. The salespersons accessed the Partner Data and

learned when a CRO had won a contract. The salesperson contacted the pharmaceutical company and made a sales pitch, offering to sell the Medidata clinical trial platform directly to the pharmaceutical company with a price below the bid of the CRO that won the contract.

19. Plaintiff noticed the practice and that the salespeople on the Direct Sales Division called the practice, "Taking ASF Direct." ASF refers to "Application Service Fees," the monthly software subscription fees paid by sponsors.

20. On or about April 1, 2022, clinical study volume had dropped off significantly after the COVID pandemic. The practice accelerated. plaintiff objected because the practice breached the confidentiality promise in the Partnership Agreements that his team members and he had negotiated with the CROs that were his division's key customers.

21. By 2024, the Life Sciences Division of Medidata had institutionalized this sales practice. Plaintiff complained and objected in meetings, in Power Point slides and face to face conversations within his team, to supervisors, as well as to corporate executives responsible for the supervision and reporting of certain business practices within Defendant's control.

22. The "Taking ASF Direct" practice had dire results for the customers, the CROs. They were deprived of profits on the sales that they had won with the pharmaceutical companies; they were deprived of rebates, and, finally, they were deprived of the right to claim reductions of amounts owed to Medidata under the sales agreement.

23. Plaintiff told his team that anyone who engaged in the practice would be fired.

24 After plaintiff's prior supervisor retired, he began reporting directly to a new supervisor, Executive Vice President Janet Butler effective April 1, 2024. Ms. Butler ignored the legal implications of this practice and instructed her direct reports to "Take ASF Direct" with the stated goal of increasing her division's incremental revenue and booking growth.

25. No employee was disciplined for using Partner Data, a practice that had been condemned under prior management and was clearly and unequivocally improper under the Agreements Medidata had with the CROs.

26. Instead, the illegal practices became deliberate and flagrant. Among other developments, employees who engaged in the practice were promoted. A special bonus was declared, and the practice was elevated and given its own designated revenue stream.

27. Further, the Direct Sales team opened shell files, "opportunities", before they contacted the pharmaceutical company and with no request for a quote from a pharmaceutical company, so they could hide the fact that the real opportunity was coming from the salesman poaching the confidential CRO Partner Data.

28. Plaintiff disclosed the impact of the surge of direct sales on the CRO/Partners in his November 2023 Partner Sales Trends Presentation.

29. Another presentation in the April 2024 Partners Forecast presentation dated May 15, 2024, showed the impact of the practice on the CRO's obligations under the Partner agreement causing them to be, collectively, [redacted] in the amounts they owed to Medidata. Furthermore, the CROs were not earning rebates on software subscriptions for the sales that had been taken by the Medidata sales team.

30. Plaintiff 's supervisor berated him, using foul language and did not approve of his denunciation of the practice. His supervisor reprimanded him for trying to create fair deals for CROs who had been harmed by the practice.

31. On October 4, 2024, plaintiff's supervisor telephoned him and said that he "did not represent the values of being a manager at Medidata." In order to substantiate the forthcoming constructive discharge, Plaintiff was accused of conduct that was allegedly

detrimental to his team and to the company. When Plaintiff requested the requisite 'proofs' from the Defendant's Human Resources department Plaintiff was informed that no such documentation existed, further bolstering the fact that the accusations were nothing but a fiction.

32. Plaintiff was demoted to work outside of the Global Partners division, alone and on his own, in a position as "Vice President of Strategic Agreements." This was a job that had been created only for him. There was no job description, there were no direct reports, an unknown bonus structure, and reporting to an individual of even lower rank than his prior supervisor.

33. His office was moved to Iselin, New Jersey requiring daily office presence, to perform a role as an office-based deal maker for brands outside of Clinical Trials software and services, the only areas where he had ever worked for Medidata. In other words, Plaintiff was given a position with no structure, no plan, no commission rates, no customers, and no ability to move upward.

34. Before his demotion, he was allowed to work remotely out of his home in Morristown, Morris County, New Jersey. By contrast, Iselin, New Jersey involved a difficult, daily commute.

35. Medidata took retaliatory action against Plaintiff because Plaintiff disclosed, or threatened to disclose, to a supervisor or to a public body, an activity, policy or practice of Medidata, with whom there was a business relationship, that Plaintiff reasonably believed is in violation of a law, or a rule or regulation issued under the law.

36. Medidata took retaliatory action against Plaintiff because Plaintiff provided information involving deception of, or misrepresentation to, any shareholder, investor, client,

patient, customer, employee, former employee, retiree or pensioner of Medidata or any governmental entity.

37. Medidata took retaliatory action against Plaintiff because Plaintiff provided information regarding perceived criminal or fraudulent activity, policy or practice of deception or misrepresentation which Plaintiff reasonably believed may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of Medidata.

38. Medidata took retaliatory action against Plaintiff because Plaintiff objected to, or refused to participate in, any activity, policy or practice which Plaintiff reasonable believed: 1) was in violation of a law, or a rule or regulation issued under the law; 2) was fraudulent or criminal; or 3) was incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

39. Medidata discharged, suspended, demoted, and/or took other adverse employment action again Plaintiff because Plaintiff reported, or threatened to report, Medidata's violations of the law.

40. Medidata's actions against Plaintiff constitute a violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.

WHEREFORE, plaintiff respectfully demands judgment in his favor and against the Defendant as follows:

(a) Awarding an injunction to restrain any violation of N.J.S.A. 34:19-1 et seq.;

(b) Awarding the payment to Plaintiff for reasonable costs, attorney's fees, and civil fines;

(c) Awarding actual, consequential, compensatory, nominal, and punitive damages;

(d) Awarding pre-judgment and post-judgment interest; and

(e) Awarding such other and further relief as this court deems just and proper.

**SECOND COUNT**
Wrongful Discharge in Violation of Public Policy
*Pierce v. Ortho Pharmaceutical Corp*. 84 N.J. 58 (1980)

41. Plaintiff incorporates the allegations of paragraphs 1 through 40 above, as if fully and completely set-forth herein.

42. Plaintiff complained about various violations of the law as committed by Medidata and reasonably believed Medidata's conduct violated the law.

43. The reasons for Plaintiff's constructive discharge were in whole, or in part, as a result of his complaints of Medidata's illegal conduct.

44. Medidata's retaliation against Plaintiff for these reasons violated public policy as they were retaliatory action because he refused to participate in any activity, policy or practice which he reasonably believed was: (1) a violation of a law, rule or regulation, (2) fraudulent or criminal or (3) is incompatible with a clear mandated public policy.

45. Plaintiff was an at-will employee and did not have an employment contract with Medidata.

46. Governmental policies prevent Medidata from using the right to discharge at will as a means of oppression.

47. Medidata's constructive discharge of Plaintiff was motivated by bad faith or malice and was against public interest.

48. Medidata breached its implied covenant to act in good faith with Plaintiff.

46. The interests of Plaintiff and the public limit the right of Medidata to terminate an employee at will by means of oppression.

47. Plaintiff had an interest in knowing he would not be discharged for exercising his

legal rights.

48. The public has an interest in 1) employment stability; 2) the honesty and integrity of the open market; 3) protection against violation of mail and other fraud; 4) protecting individuals who come forward to report illegalities of their employers; and 5) preventing wrongful discharge by means of oppression.

49. Medidata' discharge of Plaintiff was wrongful and contrary to a clear mandate of these public policies.

WHEREFORE, plaintiff respectfully demands judgment in his favor and against the defendant as follows:

(a) Awarding an injunction to restrain any violation of public policy;

(b) Awarding the payment to Plaintiff for reasonable costs, attorney's fees, costs of suit, and civil fines;

(c) Awarding actual, consequential, compensatory, nominal and punitive damages;

(d) Awarding pre-judgment and post-judgment interest; and

(e) Awarding such other and further relief as this court deems just and proper.

**THIRD COUNT**

Unjust Enrichment

50. Plaintiff incorporates the allegations of paragraphs 1 through 49 above, as if fully and completely set-forth herein.

51. Plaintiff's position with Defendant was such that the success of the team of employees he supervised resulted in increased bonuses and pay to him based upon his commissions. Plaintiff's agreement and commission schedule with Defendant would have resulted in increased remuneration in the form of commissions and bonuses had the CROs information not been shared

in violation of the contracts between the CROs and Defendant.

52. As a result of Defendant's improper actions, and solely for the purposes of making itself more money, Defendant improperly shared information from the CROs that resulted in lost revenue for Plaintiff.

53. As a result of this practice, Defendant was unjustly enriched at Plaintiff's expense.

WHEREFORE, plaintiff respectfully demands judgment in his favor and against the defendant as follows:

(a) Awarding the payment to Plaintiff for reasonable costs, attorney's fees, costs of suit, and civil fines;

(b) Awarding actual, consequential, compensatory, nominal and punitive damages;

(c) Awarding pre-judgment and post-judgment interest; and

(d) Awarding such other and further relief as this court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

In accordance with R. 4:25-4 of the Rules of Court, Plaintiffs, hereby designates Ellen O'Connell, Esq. as trial counsel for the within matter.

**CERTIFICATION**

I certify that I have no knowledge of any other action or arbitration involving the matter in controversy, nor have I any knowledge at this time of any additional parties who should be joined in this action.

PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
Attorneys for Plaintiff

Ellen O'Connell, Esq.

Dated: March 31, 2025

# Civil Case Information Statement

## Case Details: MIDDLESEX | Civil Part Docket# L-001959-25

**Case Caption:** MELE JOSEPH VS MEDIDATA SOLUTIONS, INC.
**Case Initiation Date:** 04/01/2025
**Attorney Name:** ELLEN O'CONNELL
**Firm Name:** PRICE MEESE SHULMAN & D'ARMINIO PC
**Address:** 50 TICE BLVD, STE 380
WOODCLIFF LAKE NJ 07677
**Phone:** 2013913737
**Name of Party:** PLAINTIFF : Mele, Joseph
**Name of Defendant's Primary Insurance Company** (if known): Unknown

**Case Type:** WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA)
**Document Type:** Complaint with Jury Demand
**Jury Demand:** YES - 12 JURORS
**Is this a professional malpractice case?** NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO
**Does this case involve claims related to COVID-19? NO**

**Are sexual abuse claims alleged by: Joseph Mele? NO**

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

**CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION**

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO **Title 59?** NO **Consumer Fraud?** NO **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

04/01/2025
Dated

/s/ ELLEN O'CONNELL
Signed

# EXHIBIT B

PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
Ellen O'Connell, Esq. (Bar No. 029631983)
eoconnell@pricemeese.com
50 Tice Boulevard
Woodcliff Lake, NJ 07675
(201) 391-3737 ext. 125
Attorneys for Plaintiff, Joseph Mele

| | |
|---|---|
| JOSEPH MELE | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiff, | DOCKET NO. : |
| vs. | CIVIL ACTION |
| MEDIDATA SOLUTIONS INC., A Delaware Corporation. | **COMPLAINT AND JURY DEMAND** |
| Defendant | |

Plaintiff, through his undersigned counsel, hereby complains against the defendant as follows:

## THE PARTIES

1. Plaintiff Joseph Mele, at all relevant times, was a resident of the State of New Jersey, residing at 15 Washington Valley Road, Morristown, Morris County, New Jersey.

2. Defendant Medidata Solutions, Inc., (herein after "Medidata"), upon information and belief Medidata, is organized under the laws of the State of Delaware and has an office

located in the State of New Jersey located at 194 S. Wood Avenue Iselin, Middlesex County, New Jersey. Medidata is registered under the laws of this State and as such is qualified to transact business in New Jersey.

**JURISDICTION AND VENUE**

3. This court has jurisdiction over the defendant Medidata because it has agents for the transaction of business in New Jersey and provides services to persons located in New Jersey, including the office in Iselin, New Jersey, plaintiff's last assigned place of work .

4. Venue is proper in this County pursuant to R. 4:3-2 (b) of the Rules of Court because Medidata has a place for doing business in this County.

**GENERAL BACKGROUND**

5. Medidata provides cloud-based computer systems for clinical research and pharmaceutical development. Medidata has up to 90% market share in large and mid-size clinical research organizations. More than 70% of novel drugs approved by the FDA in 2022 used Medidata software.

6. Plaintiff was employed as a high-performing executive for Medidata Solutions, Inc. since 2018, with laudable performance reviews and awards. He was promoted to Vice President, Global Partners in Medidata's "America's Enterprise" division from April 1, 2022, through October 4, 2024, where he managed a global team of approximately 50 people.

7. Plaintiff engaged in activity protected by the New Jersey Conscientious Employee Protection Act ("CEPA") by complaining to supervisors and refusing to engage in illegal activity.

8. Plaintiff's supervisor and other executives of Medidata knew that he engaged in CEPA-protected activity. Despite knowing that Plaintiff was engaged in protected activity pursuant to CEPA, as a result of Plaintiff's complaints to supervisors and other corporate officers, Medidata engaged in conduct which is barred under CEPA.

9. Plaintiff's supervisor and other executives demoted and constructively discharged him on October 4, 2024, because: he complained to his supervisor and during Division sales meetings about fraudulent and illegal business activity; highlighted this institutionalized fraud in his presentations at sales meetings; instructed his direct reports not to engage in these fraudulent and illegal acts and refused to obey his supervisor's directives to condone the bad acts.

10. As a result, plaintiff's supervisor demoted him and later transferred him to a new position that had been created for him, had no job description, no compensation bonus plan and no direct reports doing work outside of the Clinical Research platform, which no reasonable executive would be expected to accept. The aforementioned action by Medidata resulted in the constructive and improper discharge of Plaintiff.

## FIRST COUNT
## Violation of the Conscientious Employee Protection Act

11. Plaintiff incorporates the allegations of paragraphs 1 through 10 above, as if fully and completely set-forth herein.

12. Medidata describes itself as providing "the most used platform for clinical trials around the world, powering tens of thousands of clinical trials, with millions of patients[1]." The clinical trials are for drug research and development conducted by pharmaceutical companies.

[1] www.medidata.com/en/leadership/tarek-sherif/

The pharmaceutical companies hire clinical research organizations ("CROs") which conduct and report the results of the clinical trials pursuant to FDA regulations.

13. At all times relevant plaintiff was responsible for selling Medidata's software and cloud services to the CROs.

14. Medidata and CROs sign a "Medidata Partnership Agreement" (the "Partnership Agreement") by which Medidata licenses to the CROs the right to use the software and platform for clinical trials that the CROs conducted for their sponsors, the pharmaceutical companies.

15. There is a clause in the Partnership Agreement where Medidata agrees that it will not use confidential information, including "Partner Data", without the prior written consent of the Partner [CRO]."

16. Partner Data includes the information that the CRO gives Medidata about the sales the CROs make to the pharmaceutical companies, including when the CRO presents a bid to a pharmaceutical company, how they are bidding, and when the CRO is the successful bidder and wins the contract with the pharmaceutical company.

17. In the course of his employment, plaintiff became aware of improper practices within his department. Medidata's improper practices included, but were not limited to, the following:

a. Section 7.03 of the Partner Agreements were breached as Partner Data in CROs' bids were disclosed and converted to benefit Medidata.
b. 18 U.S.C. §1341 and 1143, Frauds and Wire Fraud were violated because of Medidata's scheme to defraud the CROs by breaching the Partnership Agreement using the U.S. mails and email.

18. A division of Medidata, the Direct Sales Division, started authorizing its salespersons to breach the confidentiality term of the Partnership Agreement for thousands of clinical trials being conducted around the world. The salespersons accessed the Partner Data and

learned when a CRO had won a contract. The salesperson contacted the pharmaceutical company and made a sales pitch, offering to sell the Medidata clinical trial platform directly to the pharmaceutical company with a price below the bid of the CRO that won the contract.

19. Plaintiff noticed the practice and that the salespeople on the Direct Sales Division called the practice, "Taking ASF Direct." ASF refers to "Application Service Fees," the monthly software subscription fees paid by sponsors.

20. On or about April 1, 2022, clinical study volume had dropped off significantly after the COVID pandemic. The practice accelerated. plaintiff objected because the practice breached the confidentiality promise in the Partnership Agreements that his team members and he had negotiated with the CROs that were his division's key customers.

21. By 2024, the Life Sciences Division of Medidata had institutionalized this sales practice. Plaintiff complained and objected in meetings, in Power Point slides and face to face conversations within his team, to supervisors, as well as to corporate executives responsible for the supervision and reporting of certain business practices within Defendant's control.

22. The "Taking ASF Direct" practice had dire results for the customers, the CROs. They were deprived of profits on the sales that they had won with the pharmaceutical companies; they were deprived of rebates, and, finally, they were deprived of the right to claim reductions of amounts owed to Medidata under the sales agreement.

23. Plaintiff told his team that anyone who engaged in the practice would be fired.

24 After plaintiff's prior supervisor retired, he began reporting directly to a new supervisor, Executive Vice President Janet Butler effective April 1, 2024. Ms. Butler ignored the legal implications of this practice and instructed her direct reports to "Take ASF Direct" with the stated goal of increasing her division's incremental revenue and booking growth.

25. No employee was disciplined for using Partner Data, a practice that had been condemned under prior management and was clearly and unequivocally improper under the Agreements Medidata had with the CROs.

26. Instead, the illegal practices became deliberate and flagrant. Among other developments, employees who engaged in the practice were promoted. A special bonus was declared, and the practice was elevated and given its own designated revenue stream.

27. Further, the Direct Sales team opened shell files, "opportunities", before they contacted the pharmaceutical company and with no request for a quote from a pharmaceutical company, so they could hide the fact that the real opportunity was coming from the salesman poaching the confidential CRO Partner Data.

28. Plaintiff disclosed the impact of the surge of direct sales on the CRO/Partners in his November 2023 Partner Sales Trends Presentation.

29. Another presentation in the April 2024 Partners Forecast presentation dated May 15, 2024, showed the impact of the practice on the CRO's obligations under the Partner agreement causing them to be, collectively, [redacted] in the amounts they owed to Medidata. Furthermore, the CROs were not earning rebates on software subscriptions for the sales that had been taken by the Medidata sales team.

30. Plaintiff 's supervisor berated him, using foul language and did not approve of his denunciation of the practice. His supervisor reprimanded him for trying to create fair deals for CROs who had been harmed by the practice.

31. On October 4, 2024, plaintiff's supervisor telephoned him and said that he "did not represent the values of being a manager at Medidata." In order to substantiate the forthcoming constructive discharge, Plaintiff was accused of conduct that was allegedly

detrimental to his team and to the company. When Plaintiff requested the requisite 'proofs' from the Defendant's Human Resources department Plaintiff was informed that no such documentation existed, further bolstering the fact that the accusations were nothing but a fiction.

32. Plaintiff was demoted to work outside of the Global Partners division, alone and on his own, in a position as "Vice President of Strategic Agreements." This was a job that had been created only for him. There was no job description, there were no direct reports, an unknown bonus structure, and reporting to an individual of even lower rank than his prior supervisor.

33. His office was moved to Iselin, New Jersey requiring daily office presence, to perform a role as an office-based deal maker for brands outside of Clinical Trials software and services, the only areas where he had ever worked for Medidata. In other words, Plaintiff was given a position with no structure, no plan, no commission rates, no customers, and no ability to move upward.

34. Before his demotion, he was allowed to work remotely out of his home in Morristown, Morris County, New Jersey. By contrast, Iselin, New Jersey involved a difficult, daily commute.

35. Medidata took retaliatory action against Plaintiff because Plaintiff disclosed, or threatened to disclose, to a supervisor or to a public body, an activity, policy or practice of Medidata, with whom there was a business relationship, that Plaintiff reasonably believed is in violation of a law, or a rule or regulation issued under the law.

36. Medidata took retaliatory action against Plaintiff because Plaintiff provided information involving deception of, or misrepresentation to, any shareholder, investor, client,

patient, customer, employee, former employee, retiree or pensioner of Medidata or any governmental entity.

37. Medidata took retaliatory action against Plaintiff because Plaintiff provided information regarding perceived criminal or fraudulent activity, policy or practice of deception or misrepresentation which Plaintiff reasonably believed may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of Medidata.

38. Medidata took retaliatory action against Plaintiff because Plaintiff objected to, or refused to participate in, any activity, policy or practice which Plaintiff reasonable believed: 1) was in violation of a law, or a rule or regulation issued under the law; 2) was fraudulent or criminal; or 3) was incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

39. Medidata discharged, suspended, demoted, and/or took other adverse employment action again Plaintiff because Plaintiff reported, or threatened to report, Medidata's violations of the law.

40. Medidata's actions against Plaintiff constitute a violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.

WHEREFORE, plaintiff respectfully demands judgment in his favor and against the Defendant as follows:

(a) Awarding an injunction to restrain any violation of N.J.S.A. 34:19-1 et seq.;

(b) Awarding the payment to Plaintiff for reasonable costs, attorney's fees, and civil fines;

(c) Awarding actual, consequential, compensatory, nominal, and punitive damages;

(d) Awarding pre-judgment and post-judgment interest; and

(e) Awarding such other and further relief as this court deems just and proper.

**SECOND COUNT**
Wrongful Discharge in Violation of Public Policy
*Pierce v. Ortho Pharmaceutical Corp*. 84 N.J. 58 (1980)

41. Plaintiff incorporates the allegations of paragraphs 1 through 40 above, as if fully and completely set-forth herein.

42. Plaintiff complained about various violations of the law as committed by Medidata and reasonably believed Medidata's conduct violated the law.

43. The reasons for Plaintiff's constructive discharge were in whole, or in part, as a result of his complaints of Medidata's illegal conduct.

44. Medidata's retaliation against Plaintiff for these reasons violated public policy as they were retaliatory action because he refused to participate in any activity, policy or practice which he reasonably believed was: (1) a violation of a law, rule or regulation, (2) fraudulent or criminal or (3) is incompatible with a clear mandated public policy.

45. Plaintiff was an at-will employee and did not have an employment contract with Medidata.

46. Governmental policies prevent Medidata from using the right to discharge at will as a means of oppression.

47. Medidata's constructive discharge of Plaintiff was motivated by bad faith or malice and was against public interest.

48. Medidata breached its implied covenant to act in good faith with Plaintiff.

46. The interests of Plaintiff and the public limit the right of Medidata to terminate an employee at will by means of oppression.

47. Plaintiff had an interest in knowing he would not be discharged for exercising his

legal rights.

48. The public has an interest in 1) employment stability; 2) the honesty and integrity of the open market; 3) protection against violation of mail and other fraud; 4) protecting individuals who come forward to report illegalities of their employers; and 5) preventing wrongful discharge by means of oppression.

49. Medidata' discharge of Plaintiff was wrongful and contrary to a clear mandate of these public policies.

WHEREFORE, plaintiff respectfully demands judgment in his favor and against the defendant as follows:

(a) Awarding an injunction to restrain any violation of public policy;

(b) Awarding the payment to Plaintiff for reasonable costs, attorney's fees, costs of suit, and civil fines;

(c) Awarding actual, consequential, compensatory, nominal and punitive damages;

(d) Awarding pre-judgment and post-judgment interest; and

(e) Awarding such other and further relief as this court deems just and proper.

**THIRD COUNT**

Unjust Enrichment

50. Plaintiff incorporates the allegations of paragraphs 1 through 49 above, as if fully and completely set-forth herein.

51. Plaintiff's position with Defendant was such that the success of the team of employees he supervised resulted in increased bonuses and pay to him based upon his commissions. Plaintiff's agreement and commission schedule with Defendant would have resulted in increased remuneration in the form of commissions and bonuses had the CROs information not been shared

in violation of the contracts between the CROs and Defendant.

52. As a result of Defendant's improper actions, and solely for the purposes of making itself more money, Defendant improperly shared information from the CROs that resulted in lost revenue for Plaintiff.

53. As a result of this practice, Defendant was unjustly enriched at Plaintiff's expense.

WHEREFORE, plaintiff respectfully demands judgment in his favor and against the defendant as follows:

(a) Awarding the payment to Plaintiff for reasonable costs, attorney's fees, costs of suit, and civil fines;

(b) Awarding actual, consequential, compensatory, nominal and punitive damages;

(c) Awarding pre-judgment and post-judgment interest; and

(d) Awarding such other and further relief as this court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

In accordance with R. 4:25-4 of the Rules of Court, Plaintiffs, hereby designates Ellen O'Connell, Esq. as trial counsel for the within matter.

**CERTIFICATION**

I certify that I have no knowledge of any other action or arbitration involving the matter in controversy, nor have I any knowledge at this time of any additional parties who should be joined in this action.

PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
Attorneys for Plaintiff

Ellen O'Connell, Esq.

Dated: March 31, 2025

# EXHIBIT C

JOSEPH F. MELE Plaintiff
vs.
MEDIDATA SOLUTIONS INC., A Delaware Corporation Defendant

Superior Court of New Jersey
Venue: LAW DIVISION
Docket Number: MID-L-001959-25

**Person to be Served** (Name & Address):
MEDIDATA SOLUTIONS INC., A Delaware Corporation
C/O REG AGENT- CT CORP (NJ)
820 Bear Tavern Road, Ewing, NJ 08628

## AFFIDAVIT OF SERVICE
(For use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

______

**Attorney:**
PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
Ellen O'Connell, Esq. (Bar No. 029631983)
eoconnell@pricemeese.com
50 Tice Boulevard
Woodcliff Lake, NJ 07675
(201) 391-3737 ext. 125
Attorneys for Plaintiff, Joseph F. Mele

**Papers Served:**
SUMMONS AND COMPLAINT TAN CIS

**Service Data:**
Served Successfully [X] Not Served [ ] Date Thu, Apr 03 2025 Time: 10:40 AM
Attempts: 1

[ ] Delivered a copy to him / her personally
[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)
[X] Left a copy with a person authorized to accept service, e.g., management agent, registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship or title
Intake Specialist: Chimere Brooks -MANAGING AGENT

**Description of Person Accepting Service:**

Sex: Female Age: 35 Height: 5'6" Weight: 160 Skin Color: African American Hair Color: Black

**Unserved:**

[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] No response on: Date: ______ Time: ______ Date: ______ Time: ______
[ ] Other: ______ Comments or Remarks ______

**Server Data:**

Subscribed and Sworn to me this 5 day of April 2025

Notary Signature
Name of Notary, commission expiration.

I, Manny Bayo, was at the time of service a competent adult and not having a direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

*RUSH LEGAL SERVICES LLC, 50 MAIN STREET HACKENSACK, NJ 07601,*

CHRISTOPHER J MULLEN
Notary Public, State of New Jersey
Commission # 2389225
My Commission Expires Sep 3, 2029

Affidavit of Service (9/30/2002)



CS CamScanner